# RECORDED CLAIMS STATEMENT

| Insured<br>Dr. Barry Shah | | Claim No.<br>10330-96623 | File Name<br>gbri0041.lg |
|---|---|---|---|
| Name of Person Giving Statement<br>Dr. Barry Shah | | Relationship to Accident<br>Policyholder | |
| Date Taken<br>2/1/05 | Date of Loss<br>12/22/04 | Interviewer<br>Bill Brady | |

Q: My name is Bill Brady, I'm an insurance adjuster with GAB Robbins. Today is February 1st, 2005, approximately 11:30 a.m. I'm meeting at the office of Dr. Barry Shah, Two Dudley Place?

A: Street.

Q: Two Dudley Street. Providence, Rhode Island. And also present is Dr. Shah's, public adjuster, Mr. Richard Arby [phonetic]. We've come to discuss, uh, a claim for water damage to Dr. Shah's property located at 386 Atwell Avenue [phonetic] in Providence, Rhode Island. Dr. Shah, you realize I'm recording this?

A: Yes. I do.

Q: And with your permission, sir?

A: Absolutely.

Q: Would you, please, state your name and, and spell your name for me, Dr. Shah?

A: Barry, B-a-r-r-y, Shah, S-h-a-h.

Q: And your occupation, please?

A: A physician.

Q: And the building at 386 Atwell Avenue in Providence, how long have you owned that building?

A: Uh, 20 years, to be exact.

Q: Okay. And what was that, uh, [clears throat] excuse me, used as or for?

A: For medical practice.

Q: Okay. Medical offices and such?

A: That's right.

Q: Um, I, I note, being in the building, it's a three story building, correct?

A: It is two story above the ground, and a basement.

Q: Okay.

A: Which is a finished basement.

Q: Okay. Could you kind of explain or briefly indicate which of the three, uh, which of the three floors, what they were used for?

A: The top floor was used mostly for administrative purposes, that's where patients checked in and records are kept and, uh, basic business aspect. The ground floor was used for patient care purpose, examination rooms, and, uh, basically that. And the basement was not used at the time, however for storage, uh, and again, additional administrative and, uh, and support staff use.

Q: Okay. Have you been the sole owner of the property, Dr. Shah, for the whole 20 years?

A: No. I do have a partner.

Q: And who is that?

A: A Dr. Razer Shah [phonetic], who happens to be my business partner, as well.

Q: Okay. Uh, a relation to yourself?

A: No. There's no blood relationship, but, uh, identical last name.

Q: Sure. Okay. Has there been any change in occupancy of that building, uh, since you're owned it?

A: No.

Q: Okay. Um, is it still, now this, this claim in question, with the time of discover on December 22nd, at that time, should these, prior to that being discovered, had there been any change in how the building was being used?

A: Uh, yes. We were, uh, uh, basically, uh, uh, renovating inside the building for a period of a month and a half.

Q: Okay. Um, did you actually, were you still able to use the property for your normal medical practice at that time?

A: It was possible to use it anytime, it, it was equipped, it was fully furnished, all that, uh, medical, uh, and, uh, and, uh, uh, well, yes.

Q: Okay.

A: It was, uh...

Q: Let me, let me go a little deeper then...

A: All right.

Q: Were you using it as, were you still like seeing patients or, or, at that property at that time?

A: No. I stopped seeing patients on October 11th, uh, that was because the, uh, construction we are doing, uh, renovation we were doing, was messy. Uh, and it was not possible, basically, to see patients on an ongoing basis.

Q: Okay.

A: And that, right.

Q: What, what renovations, Dr. Shah, were you having done?

A: There was a, uh, little leak on the roof that was fixed, uh, uh, ceiling tiles were changed, because it was dirty, you know, over the years. And walls were painted, and window panes were renewed, because there was a leak, you know, and cold air coming through. So, uh, brand new, uh, window panes, were replaced. And wallpapers were, were renewed and, uh, some carpeting was, uh, removed and renewed.

Q: Was that done throughout every room or was it specific rooms?

A: It, it was done, not in every room. No. In different areas of the building.

Q: Okay. And what was, uh, the reason for the work that you had done?

A: The reason was, uh, my business partner decided to retire. And he has, since. And, uh, we had two locations of practice, one was at 386 Atwell Avenue, as you indicated, and, and the other one is Two Dudley Street, where we are speaking at the present time. And it obviously was not possible for me to run both locations as a solo practitioner. This place, this existing office, is a rented office. So my plan was to basically move my entire practice to that location. And I decided to renovate the building before I could move in for a new practice.

Q: Okay. What was the, uh, your time frame for, had you had, did you have a time frame for planning to move back to that property?

A: I was hoping by January 1st.

Q: Of 2005?

A: Of 2005.

Q: Okay. So there were no, did you have any intentions or any thoughts of, of selling that property?

A: It was discussed between me and my partner, depending on the price that we would agree upon. And if it was financially, uh, feasible, I would purchase his share of the building and remain there. But if I could not afford it, in other words, we might have basically put it for sale.

Q: Okay. Do you know, was the property s-, uh, being showed to any perspective buyers, are you aware?

A: It wa-, not buyers. No. But a real, a real estate agent was supposed to see the building and give us some idea of what the market value of the building, on that that very morning of the incident.

Q: Okay.

A: Of the accident, actually, he did show up when it was still raining from every ceiling in the building.

Q: Sure. Okay. Wh-, what, uh, do you, do you know the, uh, name of that, uh, realtor, doctor?

A: Yes. Uh, a Mr. Al, I believe, it stands for Albert, Iocovo [phonetic].

Q: And do you know who he, what firm he's with or?

A: At the moment, I don't, he was introduced, uh, by my partner, he knows the person...

Q: Okay.

A: Uh, directly.

Q: Who had been hired to do the renovations, do you know?

A: A Mr. Raymond Forest [phonetic].

Q: Okay. Do you know the, uh, was he, was he hired for a specific contract, do you, uh, you know, do you know the size of the, uh, the dollar of, of his contract?

A: There was no contract written in advance. He was hired to do what is needed to be done, and then send us a bill, which he did, and he was paid.

Q: Okay. So there was no like price negotiated up front with him, so to speak?

A: No. Uh, it, as work went on, we needed more and more, and that's how we basically worked.

Q: Okay. Do you know what the, uh, uh, his final bill was?

A: Uh, exact number, I could tell you later, I don't have it up...

Q: How about approximate?

A: On my head, uh, was upper, it was 8.800, 8,000, close to $9,000.

Q: Okay.

A: Roughly, for him, and also, uh, I paid $9.000 to, uh, repave the parking lot.

Q: Okay. At the same time?

A: Well, simultaneously.

Q: The same time frame?

A: Simultaneously. Right.

Q: Was, uh, so the contractor, was he in there pretty much on a daily basis doing this work?

A: Yes.

Q: Okay. Do you know when he finished?

A: Early December.

Q: Okay.

A: Uh, I believe, December 3rd or 4th, was his last day.

Q: Okay. Um, how frequently did you yourself, doctor, after October 11th and prior to this damage being discovered, were you ever in the building at all or?

A: Oh, yes. Uh, at least, two, three times a week, not only checking on the work progress, uh, but also checking on some other issues, like checking the mail, that was still getting there. Uh, and, uh, then, looking into equipment and supplies that we have in the building, basically, to figure out what I need, what I don't, you know, when I move in.

Q: Okay. So mail was still being delivered there?

A: Yes.

Q: Okay. How about as far as, if after the, the contractor was done, say in early December, what steps were taken, was heat being maintained in the building?

A: Uh, please, clarify what...

Q: Uh, in other words, if, if the contractor was done in early December, correct?

A: Right.

Q: And this was discovered in December 22nd, was heat left on in the building in that time frame?

A: I, he had a key that he could go in.

Q: No. Heat, heat, heat.

A: Heat?

Q: Heat.

A: Heat was on. Yes.

Q: Okay. Uh, what, what type of heat is in that?

A: It's a gas fire, uh, hot air.

Q: Okay. Who is that purchased through, do you know who the utility company would be or?

A: Providence Gas.

Q: Okay. Do you know what that would have been kept on, the temperature, the thermostat?

A: At 60, 62.

Q: Okay. Is, how are they controlled there, is it individual thermostats per floor, do you know, or?

A: Is it individual thermostats per floor.

Q: One per floor, or is it different?

A: One per floor.

Q: Okay.

A: Yes.

Q: And as far as you know, the heat was being kept on, on all three floors?

A: Yes.

Q: Okay. When were you aware, Dr. Shah, that there was a, this damage was discovered, how were you first notified?

A: It was approximately 2 o'clock in the morning when the alarm company that we have for the building called me. The alarm went off, and they called the police department, and when policemen showed up on the side, he could hear the water in the building, and, uh, as well as seeing the water coming out from the bottom of the door. He called the alarm company, they called me, there is such a thing, and I said, I'll be there right away. Actually, I went and met the policeman, uh, he had already called the water department, as a matter of fact, and they got into the building, I don't know how, because the doors were locked. But they got into the building and actually the water department shut the water off. Uh, by the time I got there, the water had been shut off.

Q: Who is your alarm company?

A: Uh, I could get the name later.

Q: Okay. I'll get that from you later?

A: Uh, right now I'm not sure.

Q: Is it a security alarm, is it, or is it...

A: Yes. It is a security.

Q: Okay. Uh, okay. So then what, say the day or two, or next two days or three days following the, uh, the damage was discovered, what were the next steps that you took?

A: The, the next morning, which was, what, 8 o'clock in the morning, uh, as I mentioned earlier, actually, the real estate gentleman showed up. I could not get in touch with them in advance to tell them not to come in. Uh, we met with them, you know, while there was water and leaking or dripping. And immediately we called a plumber, uh, to come and check, uh, on the pipes. Uh...

Q: Who was the plumber, do you know who it was?

A: Again, I could get the name for you...

Q: Okay. All right.

A: Later, my, my partner called them.

Q: Sure.

A: And so I don't know his name.

Q: Okay. And what did the plumber, the plumber was there that day, I assume?

A: The plumber was there that day.

Q: And what did he...

A: That's right.

Q: Determine, do you know or?

A: He determined there was ruptured pipes, and he started fixing.

Q: Okay. Did he indicate what had caused all of the pipes to break?

A: I never met or even talked to the plumber personally, I'm sorry, I...

Q: Okay.

A: Yeah.

Q: Uh, and then at what point and what steps, do you know what steps may have been taken as far as cleaning up or?

A: Right. The immediate, at the same time, we called the same gentleman, the same contractor that was doing the renovation in the building, Mr. Raymond Forest, uh, to come in and see what needs to be done. He started, he, he called some other companies who are specializing in, uh, water cleanup and, and drying the walls and so forth, and they started just to do that. Removing some of the furniture that were in the building, and storing them in a storage space, and cleanup the building.

Q: Okay. Um, do you know the, the company, the identity of the companies that he called in?

A: Again, I don't know. I'm sorry.

Q: Okay. And since you've owned that building, Dr. Shah, for, you know, approximately 20 years, have you ever had a problem with, not this magnitude, but of any pipes freezing or bursting?

A: Never had any freezing. No.

Q: Okay.

A: We had one incident of a water heater ruptured and leaked, which was dealt with, it was not major.

Q: Okay. What's happening at the property right now, do you know, as far as…

A: Right now, nothing is happening.

Q: Okay.

A: Because in a way, we're are in a situation of do nothing, imposed by the insurance company.

Q: What, what condition is it in, is there any, I mean, uh, some demolition has been done, I'm aware.

A: Yes.

Q: But is there any type of drying equipment on site, do you know or?

A: At the moment, I don't know, I believe, that work is concluded.

Q: Okay.

A: Yes. Right now it's, nothing is happening.

Q: Okay. Okay. Anything, Dr. Shah, while I'm still recording that I haven't specifically asked you about the entire incident, that you would like to add?

A: Uh, well, I must express my, uh, uh, some degree of unhappiness towards the insurance company, and, uh, the reaction. In other words, it took about ten days before insurance company really showed up on the premise and, and, uh, allowed us to, to proceed with additional work. Uh, some mildew, uh, was growing in the building because of the wet walls, and I'm sure over time, additional damage was done, that could have been prevented.

Q: Has that mildew been addressed, do you know, since it was discovered, has it been removed or?

A: I, I believe it has, up to some degree, but, my, uh, uh, contractor, Mr. Forest, indicated that he was told by Mr. Sayers, don't do anything. And he basically stopped and we don't know what to do next.

Q: Okay. Uh, and at this time, you have enlisted the service of Mr. Richard Arby as a public adjuster to assist you, is that correct?

A: Yes.

Q: Okay. So once again, uh, if you have nothing further to add, once again, Dr. Shah, you know that I recorded this?

A: Very well. Yes.

Q: And it was with your permission?

A: Absolutely.

Q: Okay. Let me turn the machine off?

[End of Recorded Statement.]